# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF OHIO

# EASTERN DIVISION

| | | |
|---|---|---|
| **GILBERT ACEVEDO**<br>17579 Drake Rd.<br>Strongsville, OH 44136 | ) | |
| | ) | |
| and | ) | |
| **TAMMY ACEVEDO**<br>17579 Drake Rd.<br>Strongsville, OH 44136, | ) | |
| | ) | **C O M P L A I N T** |
| Plaintiffs**,** | ) | |
| | ) | Jury Demand Endorsed hereon |
| -vs- | ) | |
| | ) | |
| **CITY OF STRONGSVILLE, OHIO**<br>13213 Pearl Rd.<br>Strongsville, OH 44136 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JOSEPH MOSKO**<br>individually and in his official capacity<br>as Building Inspector of the City of<br>Strongsville<br>13213 Pearl Rd.<br>Strongsville, OH 44136, | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

## INTRODUCTION

1.  This action is instituted to seek relief for violations of, *inter alia*, federally secured rights of fair housing on the basis of race, national origin and retaliation, denial of due process of law under color of state law and denial of equal protection under the law under color of state law.

2.  Plaintiffs claim their constitutional and federally protected statutory rights are insured under Title VIII of the Civil Rights Act of the 1968, as amended, the Fair Housing Act, and the Due Process Clause and Equal Protection Clause of the 14th Amendment to the Constitution of the United States.

## CLAIMS AND JURISDICTION

3.  This action is brought by "persons," pursuant to Title VIII of the Civil Rights Act of 1968, as amended, the Fair Housing Act, 42 U.S.C. §§3601, *et seq.* (2019 Supp.), the Civil Rights Act of 1866, 42 U.S.C. §1982 (2019 Supp.), the Civil Rights Act of 1870, as amended, 42 U.S.C. §1981 (2019 Supp.), the Civil Rights Act of 1871, 42 U.S.C. §1983 (2019 Supp.), the Due Process Clause of the 14th Amendment to the Constitution of the United States, the Equal Protection Clause of the 14th Amendment to the Constitution of the United States and the Ohio Civil Rights Act, Ohio Revised Code §§ 4112.01, *et seq.* (2019 Supp.). Jurisdiction is invoked

pursuant to §§3613 and 3617 of Title VIII of the Civil Rights Act of 1968, as amended, Sections 813 and 818 of the Fair Housing Act, and 28 U.S.C. §§1343(3) and (4) with respect to the other federal claims as well as state common law tort and civil rights claims pursuant to 28 U.S.C. §1367.

## PARTIES

4. Plaintiffs, GILBERT AND TAMMY ACEVEDO ("Acevedos") are "persons" as defined by the Act and are residents of the City of Strongsville, Ohio.

5. Plaintiff are or have been perceived as a non-white, Hispanic family.

6. Defendant, CITY OF STRONGSVILLE, OHIO, ("City" or "Strongsville") is a municipal corporation organized under the laws of the State of Ohio, operate under color of state law and has a duty to insure that residents may live within the borders of the City of Strongsville, Ohio free from interference, coercion and intimidation on account of race and national origin.

7. Defendant, JOSEPH MOSKO, ("Mosko") was, at all relevant times, Building Inspector for Defendant City of Strongsville, Ohio, maintained responsibility for housing and zoning policies, practices, procedures and regulations and otherwise has had a duty to comply with federal law regarding the Plaintiffs' right to apply for permits and have their

property inspected free from discrimination and retaliation on account of race and national origin.

## COUNT I

8. Plaintiffs reassert the foregoing allegations and incorporate them by reference as if fully set forth herein.

9. Defendant City of Strongsville, Ohio is a predominantly white suburb of the Greater Cleveland, Ohio, area, a metropolitan area with a highly diverse population.

10. In early 2015, Gilbert and Tammy Acevedo made the decision to buy property in the City of Strongsville, Ohio and to build a home there.

11. The Acevedo family is perceived as interracial because Gilbert is Puerto Rican-born and his wife, Tammy, is Caucasian and born in the United States.

12. Plaintiff Gilbert Acevedo has been a building contractor by trade and was excited about the opportunity to build his family a home in what they thought was a lovely, accepting community.

13. On June 8, 2015, after completing the plans for the new home, the Acevedos submitted the plans to defendant City of Strongsville, Ohio's Building Department for approval.

14. On August 29, 2015, defendant City of Strongsville, Ohio's Building Department initially approved the plans.

15. Soon after receiving approval, the Acevedos began construction.

16. When constructing a new home, builders are required to have different elements in the construction process approved at different stages.

17. Within only a few weeks of beginning construction, the Acevedos knew that something was not right.

18. Defendant City of Strongsville Ohio Building Inspector Joseph Mosko, began "red-tagging" construction,  failing the Acevedos for elements of construction which were otherwise done correctly.

19. As an example, on September 9, 2015, Mosko red-tagged the construction drive which had already been completed, noting it "needed more stone near the street edge" when it was already in compliance with city code.

20. On the same day, Mosko failed the Acevedos' "footer elevations" because he felt they needed to be raised higher, even though an engineering team had already determined that the height of the "footer elevations" was appropriate.

21. The unnecessary changes ordered by Mosko cost the Acevedos thousands of dollars to complete.

22. On September 9, 2015, the City of Strongsville issued the first complete stop work order because of an alleged water-line issue.

23. When the Acevedos contacted the building department to have an inspector come back out, the City of Strongsville intentionally delayed the process.

24. Gilbert had been in the business of contracting for many years and had not experienced governmental treatment of this nature.

25. Following the initial red-tags and stop work order, the Acevedos began facing even more failed inspections.

26. Larry Sheets, another representative of the City of Strongsville, told the Acevedos that he was failing their building footers and that, as a result, they would not be permitted to pour concrete.

27. Sheets made this determination based upon the fact that there was alleged "muck" in the footers which was not true.

28. The City of Strongsville's Larry Sheets also insisted that he wanted to have the soil tested at the Acevedos' home prior to the concrete being poured.

29. Such testing is ordinarily exclusively reserved for commercial construction, not residential construction.

30. Sheets insisted on having the test done in order to delay the Acevedos' plans.

31. When questioned about why he was engaging in a pattern of obstruction to construction, Sheets responded "this isn't Lorain."

32. Sheets made his conclusions concerning housing and "Lorain" under color of state law.

33. The Acevedos understood Sheets's statement, "this isn't Lorain," as meaning that there are substantially fewer Latino citizens living in the predominantly white Cleveland, Ohio suburb of Strongsville than the more heavily populated Latino population of the City of Lorain.

34. It is true that Lorain, Ohio is a municipality west of Cleveland with a substantial Latino population as compared to the City of Strongsville, Ohio.

35. While the government official's discriminatory statement to the Acevedos was particularly offensive and hurtful, they were fearful that reporting it was place them in future difficulties with Strongsville government officials.

36. By the end of October 2015, the City of Strongsville had already cost the Acevedos thousands of dollars in unnecessary change orders and had delayed their home building plans by over eight (8) months.

37. On December 4, 2015, Mosko failed the Acevedos' storm sewer connection for no reason and assessed them a fine.

38. Only after the Acevedos complained to the City of Strongsville did  Mosko decide to reverse his decision and partially pass the storm sewer connection which allowed work to continue.

39. Between October 2015 and April 2016, the City of Strongsville wrongfully failed at least three more inspections at the Acevedos' property.

40. The intentional and discriminatory acts by the City of Strongsville cost the Acevedos thousands of dollars more in change orders.

41. On April 1, 2016, Steve Oprea, another building inspector for the City of Strongsville, came to the Acevedos' property with a note which indicated that, until the "sanitary sewer" issue was resolved, the City of Strongsville would refuse to conduct any more the required inspections.

42. The "sanitary sewer" issue, reflected in the note delivered by the City of Strongsville's Oprea, was a problem which the City of Strongsville caused when it allowed the next door neighbor of the Acevedos to connect into the designated water tap for the Acevedos' property prior to their purchase and ownership.

43. Instead of trying to resolve the problem created by the City of Strongsville, the City of Strongsville issued a "stop work order" and expected the Acevedos to solve the problem themselves.

44. The stop work order was issued in order to prevent the Acevedos from completing their home.

45. On April 19, 2016, Gilbert requested a required inspection before the Acevedos installed siding.

46. The City of Strongsville informed the Acevedos it required "wind strapping" from the lower wood plate through the first floor walls.

47. Gilbert had never heard of the requirement as it is usually only required in cities with extremely high winds.

48. Notwithstanding, because of the requirement imposed by the City of Strongsville, arrangements were made at additional cost to complete the installation.

49. Gilbert then spoke to the City of Strongsville's Michael Miller about the "wind strapping."

50. Miller required strapping installed every eight (8) feet of the walls.

51. Gilbert then requested an inspection and spoke to Larry Sheets since he was assigned to be the Inspector.

52. On April 19, 2016, Larry Sheets was supposed to come out and meet Gilbert for the inspection in the afternoon.

53. Instead, Larry Sheets came out on April 19, 2016 in the morning and failed the inspection without even speaking to Gilbert.

54. After calling to inquire about what happened, Larry Sheets simply stated that the straps were to be installed every four (4) feet.

55. Sheets also stated that that "it didn't matter," since Gilbert "was going to lose the house to foreclosure anyway."

56. Gilbert immediately called Michael Miller and left a message on his voice mail concerning the remark, and that after doing additional research, couldn't find the wind strapping requirement anywhere in the building code.

57. The inspection was suddenly changed to "pass" with no further inspection.

58. Larry Sheets' notes simply stated "No Issues" for his part of the inspection.

59. Gilbert never received an explanation nor an apology for his remarks.

60. The unnecessary strapping costs were thousands of dollars in material and labor.

61. The "failed" inspection was removed from the ledger.

62. By this time, the Acevedos were certain that Larry Sheets and the City of Strongsville were motivated to stop them from completing the home.

63. On June 22, 2016, Larry Sheets failed an inspection on an unrelated job that Gilbert Acevedo was working on within the borders of the City of Strongsville, Ohio.

64. The job was the partial replacement of a driveway apron and a small sidewalk pad at two different locations for a customer.

65. There was no reason to fail the inspection.

66. On June 23, 2016, Jeff Mendyas, another City of Strongsville inspector, failed the apron.

67. On June 24, 2016, after a request for a different inspector and with no further changes to the apron, a different inspector passed the apron.

68. The City of Strongsville continued to summarily fail construction inspections and used its governmental power by adding additional costs to residential construction as a weapon to unlawfully discriminate in housing.

69. On June 30, 2016, Larry Sheets failed the Acevedos' underground plumbing.

70. On July 14, 2016, Sheets again summarily failed the underground plumbing inspection and added a monetary penalty.

71. The City of Strongsville, Ohio provided no explanation for the failure.

72. On July 25, 2016, after complaining to the City of Strongsville, the city partially passed the underground plumbing.

73. On June 29, 2016 the City of Strongsville, Ohio failed the Acevedo home in an electrical inspection.

74. The City of Strongsville told Gilbert that he should have hired someone more local.

75. In July 2016, Gilbert complained to Michael Miller again about the wrongful treatment he was receiving and requested another inspection.

76. Gilbert complained that Larry Sheets was summarily failing the inspections and that there was no way to know what he was failing without a list of required corrections.

77. On August 17, 2016 Michael Miller and Larry Sheets showed up for the inspection.

78. Once again Larry Sheets failed the inspection, but generated an extensive list which included matters not required by code.

79. While making the list, Larry Sheets told Acevedo that "he should work more like a white man."

80. Acevedo found the racial reference to him as offensive, hurtful and shocking to experience in the twentieth-first century in America.

81. White men have not been subjected to racial insults and unfair inspections in the City of Strongsville, Ohio.

82. The comment was made in front of the City of Strongsville's Michael Miller, Larry Sheets' superior.

83. Gilbert called Strongsville City Hall, leaving a message on Michael Miller's voicemail.

84. After finally receiving a call back from Michael Miller, Gilbert was told that he didn't think there was an issue with Larry Sheets and that he didn't really recall the remark.

85. The remark was recorded.

86. Larry Sheets continued to fail the Acevedos' plumbing, intending to increase the costs of construction.

87. Larry Sheets' racially derogatory remarks, in his official and personal capacities, confirmed to Gilbert and Tammy that they were unwelcome in the City of Strongsville, Ohio which has a limited Latino population.

88. Moreover, the Acevedos' suspicions of racism and discrimination were confirmed.

89. The City of Strongsville, Ohio took no prompt, meaningful action against Sheets and permitted the pattern of failing inspections to continue in order to punish the Acevedos who chose to live in the City of Strongsville and chose to report the inspections having a racially motivated reality.

90. The City of Strongsville did nothing to insure compliance with the Fair Housing Act, as well as Constitutional and other statutory requirements, in taking prompt, meaningful action with inspection personnel.

91. The City of Strongsville did nothing to insure that the Acevedos would feel as welcome in the City of Strongsville as "a white man."

92. On August 10, 2016, electrical Inspector Brian Roenigk, a good friend of Larry Sheets, improperly failed the Acevedos' underground electrical.

93. The Acevedos suffered additional costs to make the unnecessary changes.

94. On August 11, 2016, the Acevedos requested a re-inspection.

95. On August 15, 2016, Brian Roenigk once again failed the inspection with a monetary penalty, stating that there was not enough concrete covering the pipe in areas.

96. There was sufficient concrete covering the pipes.

97. The cost to mix and pour more concrete was an additional cost in labor and material and was unnecessary.

98. On August 26, 2016, after a number of phone calls about the remark, Larry Sheets finally passed the plumbing  inspections without any need to correct deficiencies alleged by the City of Strongsville.

99. On August 30, 2016, the Acevedos received a failed framing inspection.

100.      On September 7, 2016, Gilbert requested a consultation with the City of Strongsville's Jeff Mindyas.

101.    When Mindyas employed the "F word" on several occasions and declined to give the Acevedos a consultation, Mindyas red-tagged the property.

102.    Mindyas volunteered that he didn't care if Gilbert went to "Africa" to get "ledger lock bolts," components required in building the Acevedos' home.

103.    Insofar as the Acevedos know, ledger lock bolts are not made in Africa.

104.    The Acevedos reasonably interpreted the additional City of Strongsville's inspector's remark as racially offensive.

105.    The City of Strongsville's Mindyas generated the fear of the Acevedos that they were increasingly unwelcome within the borders of the City of Strongsville and expected, under color of state law, to endure continuing failed inspections motivated by national origin, racial discrimination and retaliation.

106.    Mindyas further informed the Acevedos that he would red-tag the home's foundation and prohibit pouring concrete for the porch, even though it had passed inspection.

107.    It was clear to the Acevedos that Mindyas' actions were fueled by discrimination and retaliation over their reporting the "white

man" comment made by Sheets and other racially discriminatory comments and treatment.

108.    Also on September 7, 2016, Steve Oprea, another building inspector at the City of Strongsville told the Acevedos to "be careful," and that he would give them additional details at a later date.

109.    On September 14, 2016, the Acevedos' electrical meter base inspection failed for no reason.

110.    On September 15, 2016, the Acevedos failed a framing inspection with another monetary penalty.

111.    The City of Strongsville also requested engineering drawings to be submitted for the garage framing, a request not made generally for white home owners.

112.    The engineering drawings cost the Acevedos additional funds.

113.    On September 16, 2016 at approximately 3:00 a.m., after a sleep-less night because of the anguish and pain of coming to the realization that they were not going to be allowed to complete the construction of their home, Gilbert uploaded the recorded remarks that Larry Sheets had made during the plumbing inspection in the presence of his supervisor Mike Miller to the City of Strongsville's intranet.

114.     On September 29, 2016, the Acevedos' driveway inspection failed with a note that at final phase the driveway must have a 1" crown.

115.     Gilbert, a longtime contractor, had never heard of nor experienced driveway inspection failure over a 1" crown.

116.     On September 29, 2016, the Acevedos' insulation inspection failed without a lawful reason.

117.     On October 7, 2016, the Acevedos' meter base inspection was failed again without good reason and was given a monetary penalty by Michael Miller.

118.     On November 1, 2016, Mosko caused a stop work because the Acevedos had allegedly not secured the required approval for the installation of the catch Basin.

119.     The approval was already part of the originally approved site plan submitted by the engineer(s) hired by the Acevedos.

120.     On January 5, 2017 Gilbert received a letter from the City of Strongsville Building Department, threatening criminal prosecution because of an open permit that was never inspected.

121.     The cause of the so-called "open permit" was because the City of Strongsville's Larry Sheets failed to report the inspection for the sidewalk.

122.    Larry Sheets intentionally listed the inspection as cancelled in an effort to get Gilbert criminally prosecuted.

123.    Gilbert spoke to the City of Strongsville Building Department and threatened to fight it since he had proof of the inspection.

124.    The City of Strongsville summarily rectified the problem but did not notify the Acevedos that they would not face criminal prosecution.

125.    The identification on the correction demand letter was 17-00045.

126.    Gilbert and Tammy knew they remained a focus of retaliation and discrimination.

127.    On July 5, 2017, after the the Acevedos installed 200 lineal feet of 12" reinforced concrete pipe for the second time based upon a request by Joseph Mosko, Mosko demanded that the catch basin be dug up and re- leveled again.

128.    The request was unnecessary, unreasonable and made only to try and run the Acevedos out of the City of Strongsville on account of race, national origin and retaliation.

129.    The total cost of the work was continuing to grow in labor, material and equipment costs.

130.     On July 10, 2017 the City of Strongsville's Inspector Steve Oprea  stopped in for a consultation relating to pouring concrete for sidewalks and the porch.

131.     During the conversation, Oprea stated that he had been wanting to talk to the Acevedos, and warned that they needed to "be careful" about the filing of any complaint or litigation because the City of Strongsville Building Department would retaliate with "red tags."

132.     On December 6, 2017, the Acevedos' final engineering inspection was failed without just cause.

133.     To date, the City of Strongsville has still not approved the final engineering inspection in order to insure that the Acevedos could never complete construction.

134.     To date, the City of Strongsville has not fully approved the building or electrical inspections for the Acevedos' home.

135.     The City of Strongsville, a predominantly white community, continuously failed the Acevedos' inspections because of Gilbert Acevedo's race and national origin and in retaliation of the expressed statement by a Strongsville official because he was not "a white man."

136.     When Gilbert complained about the discriminatory and racist remarks of Strongsville officials, he was retaliated against with

additional construction failures and red tags without any governmental justification.

137.    As a direct consequence and result of the acts and conduct of the defendants City of Strongsville, Joseph Mosko and other government officials of the City of Strongsville, Ohio, plaintiffs have suffered substantial losses in additional unnecessary costs, have been threatened with criminal prosecution which would have not been made without the documented racial preferences of the City of Strongsville government officials, and have and continue to suffer substantial physical and emotional distress as a result of the defendants unlawful conduct by individuals and under color of state law.

138.    Defendants targeted the plaintiffs under color of state law, denying Plaintiffs fair housing rights based on their national origin, race and retaliation.

139.    The acts and conduct of the defendants were and continue to be knowing, intentional, malicious and in wanton and reckless disregard of federally secured rights of fair housing on account of national origin, race and retaliation.

140.    The purpose and effect of the acts and conduct of the defendants were, and continued to be, threatening, intimidating, coercive

and otherwise designed to make providing equal housing opportunities unavailable to Plaintiffs.

## COUNT II

141.    Plaintiffs reassert the foregoing allegations and incorporate them by reference as if fully set forth herein.

142.    Plaintiffs have been denied equal housing opportunities on account of national origin, race and retaliation.

143.    Defendants are responsible for having made statements or caused to have statements made which express a preference, limitation or discrimination based on national origin, race and retaliation and have attempted to deny equal housing opportunities on the basis of national origin and race.

144.    The acts and conduct of the defendants were and continue to be knowing, intentional, malicious and in wanton and reckless disregard of federally secured and protected rights of equal housing opportunities free from considerations of national origin, race and retaliation.

145.    Defendants were and continue to be fully aware that their actions would result in the loss of money, limiting them from the finality of completing their home and would generate substantial physical and

emotional injury by employing considerations of race, national origin and retaliation.

146.     The purpose and effect of the acts and conduct of the defendants were and continue to be threatening, intimidating, coercive and otherwise making equal housing opportunities unavailable to the plaintiffs on account of their national origin, race and in retaliation for their rights asserted under Title VIII of the Civil Rights Act of 1968, as amended, and under other federal and state laws.

147.     Such conduct by the defendants has unlawfully interfered with the building of plaintiffs' home and has otherwise caused further damage to plaintiffs.

## **COUNT III**

148.     Plaintiffs reassert the foregoing allegations and incorporate them by reference as if fully set forth herein.

149.     As a condition of receiving federal funds for all recreation, transportation, community development and related activities, the City of Strongsville, through its mayor, agrees to affirmatively further fair housing.

150.     The duty to affirmatively further fair housing requires not only to adopt policies and practices that do not discriminate on the basis of race, religion, national origin, and other grounds protected by the Fair Housing Act, but to outreach and encourage those least likely to reside

within the borders of the City of Strongsville to consider the city as a place to live.

151. Those least likely to reside within the borders of the City of Strongsville are African-Americans and Latinos.

152. The City of Strongsville has disregarded its federal statutory duty to affirmatively further fair housing.

153. The City of Strongsville has intentionally ignored its federally statutory duty to affirmatively further fair housing.

154. An example of the lack of a policy and programs which require the City of Strongsville to affirmatively further fair housing is the commonplace use and consideration of racially notorious, offensive and derogatory terms and phrases which have the purpose or effect of discouraging minorities to live within the borders of the City of Strongsville, Ohio.

155. The disregard of a federally statutory duty to affirmatively further fair housing by the City of Strongsville has been borne directly on minorities living within the borders of the City of Strongsville.

156. The actions of the City of Strongsville have been willful, intentional and in wanton and reckless disregard of the rights and privileges of Gilbert and Tammy Acevedo.

157. The acts and conduct of the City of Strongsville has been in derogation of its federal statutory mandate to affirmatively further fair housing and has been intentional, malicious and in wanton and reckless disregard of that duty.

158. Defendants were and continue to be fully aware that their actions would result in the loss of money, limiting them from the finality of completing their home and would generate substantial physical and emotional injury by employing considerations of race, national origin and retaliation.

WHEREFORE, plaintiffs urge this Court to grant the following relief:

A. Declare that the acts and conduct of the defendants, individually and collectively, constitute violations of the Due Process Clause of the Constitution of the United States, the Equal Protection Clause of the Constitution of the United States, Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. §§3601, *et seq.*, as well as violations of the anti-intimidation section of the Act, Section 818, 42 U.S.C. §36l7; the Civil Rights Act of 1870, as amended, 42 U.S.C. §1981, the Civil Rights Act of 1866, 42 U.S.C. §1982 and the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Ohio Civil Rights Act, Ohio Revised Code §§ 4112.01, *et seq.*;

B. Declare that defendant City of Strongsville has an affirmative duty to further fair housing as a consequence of its receipt of federal funds under Section 808 of the Fair Housing Act, 42 U.S.C. §3608 and that it has failed to meet its federally mandated duty in the manner in which it has treated the plaintiffs and direct that the defendants engage

in necessary affirmative fair housing education to correct the effects of their unlawful discriminatory housing practices on the basis of race, national origin and retaliation;

C.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Sections 813 and 818 of the Civil Rights Act of 1968, as amended, the Fair Housing Act, 42 U.S.C. §§ 3613 and 3617, permanently enjoin the defendants, their agents, employees and representatives from engaging in any future act of intimidation, coercion, and interfering with the construction and living activities of the plaintiffs, and to cease and desist further retaliatory conduct against the plaintiffs on account of race, national origin and retaliation;

D.     Grant to the plaintiffs and against the defendants, jointly and individually, compensatory damages in the amount in excess of twenty-five thousand dollars, jointly and severally, appropriate punitive and exemplary damages against the defendants, jointly and severally except for defendant City of Strongsville, a statutory civil fine per violation of the Fair Housing Act against each defendant individually and all other relief as expressly provided by statute and all other relief as expressly provided by statute and rule including a statutory reasonable attorney fee and costs of this action;

E.     Grant any additional relief which the court deems just, equitable and in advance of the public interest.

*s/Avery Friedman*

Avery Friedman (0006103)
AVERY FRIEDMAN & ASSOCIATES
850 Euclid Ave. Ste. 701
Cleveland, Ohio 44114-3358
T: (216) 621-9282
F: (216) 621-9283
avery@lawfriedman.com
fairhousing@gmail.com

*s/ Jared S. Klebanow*

Jared S. Klebanow (0092018)
KLEBANOW LAW, LLC
850 Euclid Ave. Ste. 701
Cleveland, Ohio 44114
T: 216-621-8230
jklebanow@klebanowlaw.com


*Attorney for Plaintiffs*


**TRIAL BY JURY DEMANDED**

Plaintiffs, Gilbert and Tammy Acevedo, hereby demand a trial by jury.

*/s/ Jared Klebanow*
Jared Klebanow